**ROYAL ALLIANCE ASSOCIATES, INC.,
Gerald W. Wischmeyer, and Joseph
A. Gallino, Petitioners,**

v.

**Earl R. DAVIS, Ruby B. Davis, Raymond
E. Edester, Nan C. Foster, individually,
and as Trustee for the Foster Family
Trust and the Nan C. Foster Trust, Jul-
ian S. Foster, individually, and as Trust-
ee for the Foster Family Trust, Richard
C. Foster, Frances L. Jakob, and Robert
H. Jakob, individually, and as Trustee
for the Ethyl May Jakob Trust, Respon-
dents.**

No. 94 Civ. 5749 (WK).

United States District Court,
S.D. New York.

Sept. 5, 1995.

James M. Kaplan, Wilson, Elser, Moskow-
itz, Edelman & Dicker, New York City, for
petitioners.

John E. Lawlor, Garden City, NY, for
respondents.

### *MEMORANDUM AND ORDER*

WHITMAN KNAPP, Senior District
Judge.

Petitioners Royal Alliance Associates
(hereinafter "Royal"), a broker-dealer mem-

ber of National Association of Securities Dealers, Inc. (hereinafter "NASD"), and two of its employees, Gerald Wischmeyer and Joseph Gallino, filed this action in New York Supreme Court seeking the permanent injunction of a NASD Arbitration Proceeding brought by respondents. The arbitration pertains to petitioners' alleged failure to supervise one Robert Michael Simpson, who was registered as a Royal dealer and who served as a branch manager of Royal's office in Cocoa Beach, Florida. Respondents were all clients of Simpson, and they contend that he either borrowed or misappropriated hundreds of thousands of dollars from them.

The case was removed to this Court in August 1994, on the basis of diversity jurisdiction. Petitioners move for a permanent injunction staying the NASD arbitration. Respondents move for an order compelling arbitration under the Federal Arbitration Act, 9 U.S.C.A. §§ 1–16, and to dismiss the petition. For reasons which follow we grant respondents' motion.

## BACKGROUND

Simpson entered the securities business in 1977 as a registered representative for Merril Lynch. In 1980, he left that firm to work for E.F. Hutton as a registered representative, and later, as the manager of its office in Cocoa Beach, Florida. Between April 1987 and August 1988, twenty-three complaints against Simpson were filed by E.F. Hutton clients. The complaints claimed such misconduct as the "misplacement" of client funds; the execution of unauthorized transactions; and the making of material misrepresentations to clients in an effort to persuade them to purchase certain securities. In March 1988, a former client filed a complaint against Simpson with the Florida Securities Division accusing him of making numerous misrepresentations. Three of his E.F. Hutton clients filed suit against him in 1988; two others did so in 1989.

Simpson left E.F. Hutton in May, 1987 and, with his wife, opened up a branch office for Integrated Resources Equity Corporation ("IREC") in Cocoa Beach under the name of Simpson & Simpson, Inc. During his tenure with IREC, Simpson was the subject of a lawsuit brought in 1988 by one of his clients, asserting that he had borrowed $100,000 from the client. See *Frank M. Wolfe v. R. Michael Simpson, Sharon Simpson, and Simpson & Simpson, Inc.,* No. 88–521–CA (Fla.Cir.Ct., Brevard Co. 1988). That client was ultimately awarded a judgment of over $146,000. According to respondents, petitioner Wischmeyer was serving as a compliance officer for IREC during the pendency of the *Wolfe* action.

On or about November 20, 1989, IREC transferred all of its client accounts to Royal. Subsequently, Simpson's registration with IREC was transferred to Royal. On December 11, 1989, the Florida Division of Securities approved Royal's application for registration of Simpson's branch office.

On March 5, 1993, Simpson was censured and barred from the securities industry for 10 years by the New York Stock Exchange for the following misconduct: (1) effecting unauthorized and unsuitable transactions; (2) making material misstatements to clients; (3) misrepresenting to clients the nature of their investments; and (4) guaranteeing one client against losses and reimbursing a client for a tax liability without authorization of his employer. See NYSE Docket/Case No. 92–176.

Respondents allege that Simpson—while acting as broker for their Royal accounts— engaged in a scheme to defraud them by convincing them to sell various securities and banking instruments and to lend him the funds so obtained at interest rates higher than the rates of return on their typical investments. The securities and banking instruments in question were generally maintained in respondents' IREC or Royal accounts. Simpson offered respondents as much as 18% interest on the loans, and frequently promised them that they would be short-term.

### Respondents Nan, Julian and Richard Foster

Respondents Nan C. Foster, Julian S. Foster and Richard C. Foster became Simpson's

clients in 1981, while he was still in the employ of E.F. Hutton. They had two accounts with him, one in the name of the Foster Family trust and the other in the name of the Nan C. Foster trust. The Fosters allege that Simpson borrowed approximately $150,000 from them. In March 1990, Simpson remitted to the Fosters approximately $6,000. He has failed to repay the Fosters the remaining funds.

An affidavit submitted by Nan Foster claims the following facts. In December 1988, Simpson acted as a witness to a real estate sale for which she and her husband received a down payment of $140,000. In April 1989, Simpson asked her for a $10,000 loan stating that "if [she] placed moneys with him, [she] would received 15% interest, a rate of return that far exceeded the rate of return [she] was receiving on [her] money markets and CDs." Nan Foster Affid. at ¶ 13. On April 14, 1989, she "redeemed $2,000 worth of Integrated Money Market securities and issued a check to Simpson in the amount of $8,000." Id.

Her affidavit further contends that in June 1989 Simpson convinced the Fosters to liquidate a portion of an account they held in the Lord, Abbett & Co., L.A. Tax Free Income Fund, Inc. ("Lord, Abbett Fund"), in order to raise substantial funds to lend him. It states that at that time the Fosters' investments in the Lord, Abbett Fund were generating a 7% tax-free return. Simpson wrote a Lord, Abbett Fund representative requesting that the funds at issue be transferred to him. On June 19, 1989, he executed a promissory note which he had drafted in which he agreed to pay the Foster Family Trust principal in the amount of $59,616.38, and the greater (as of October 19, 1989) of a minimum of 15% interest or "what the L.A. Tax Free Income Fund, Inc.–National would be at maturity." Id. at ¶ 14. The affidavit continues:

> The promissory note also stated that Simpson would pay 18% interest on the note and deferred interest from the date of maturity until the note was paid. Simpson orally emphasized to us the attractiveness of the interest rates that he offered to pay on the note.

Id.

According to the affidavit, in October 1990, the Fosters redeemed $58,000 worth of Sun-American Money Market securities from the Foster Family Trust Royal account to pay taxes relating to the real estate transaction discussed above. Aware of this redemption, Simpson "requested that as consideration for a promissory note paying 18%, interest, we lend him the sum of $50,000." On November 20, 1990, the Fosters transferred the sum of $30,000 to Simpson. In November and December 1990, the Fosters transferred to Simpson $22,000 from the Foster Family Trust Royal account and $2,435 from the Nan C. Foster Family Trust Royal account "based on the expressed assurance that [they] would be receiving a rate of return that was higher than the Royal Alliance investments in which [they] had [their] money." Id. at ¶ 16. Nan Foster's affidavit also lists numerous smaller loans made to Simpson under similar circumstances.

Nan Foster further claims that Simpson misappropriated $15,000 which she had given him for deposit one of the Fosters' Royal trust accounts for the purchase of securities which he had recommended. She claims that he then deposited those funds in a different Royal account over which he had control.

The Fosters entered into two agreements with Royal relating to the two Royal trust accounts. Each contained an arbitration clause which provided:

> To the extent permitted by law, all controversies which may arise between the [customer] and [Royal Alliance] or any of their affiliated companies *concerning any transaction arising out of or relating to any account maintained by the undersigned,* or the construction, performance, or breach of this or any other agreement between us whether entered into prior to, on, or subsequent to the date hereof, shall be submitted to arbitration under the Code of Arbitration Procedure of the National Association of Securities Dealers, Inc., or the arbitration panel of any other national securities exchange in which a transaction giving rise to the claim took place, as I may elect.

Affirm. of James M. Kaplan, Ex. G at 2.[1]

### The Remaining Respondents

Respondents Frances and Joseph Jakob were also clients of Simpson, and lent him a total of approximately $60,000. As with the Fosters, Simpson promised them up to 18% interest on these personal loans which he had characterized as short-term. The Jakobs allege that Simpson defrauded them by convincing them that they would profit by redeeming securities and instruments in their Royal account to lend him money at the high interest rates which he was offering. Simpson has not repaid any of the Jakobs' money.

The remaining respondents, Raymond Edester and Ruby and Earl Davis, were also Simpson's clients and lent him funds from their Royal accounts based on his promises of high interest rates. Simpson has not repaid these loans, although he has made a few interest payments on them. Edester loaned Simpson about $32,000. The Davises loaned him approximately $20,000 by redeeming SunAmerica money market securities maintained in their Royal account, which, according to Simpson, were earning only 7%.

There is no evidence that any respondent other than the Fosters entered into any agreements with Royal containing arbitration clauses.

### The Roles of Royal, Wischmeyer and Gallino

Respondents contend that before making Simpson manager of its Cocoa Beach and Jacksonville offices, Royal and its officers either knew or should have known of his prior misconduct. In particular, they cite the *Wolfe* action brought against Simpson in 1988. According to respondents, petitioner Wischmeyer, as a compliance officer for IREC at this time, must have been aware of that lawsuit, and would thus have been warned about Simpson's habit of borrowing from clients.

Respondents also point out that Simpson conducted his illicit dealings with clients at the Royal Cocoa Beach office and maintained files in that office pertaining to such dealings. According to respondents, Simpson had his assistant at that office notarize various documents relating to the personal loans from respondents. Respondents assert that if Royal had properly supervised its Cocoa beach office, it would have discovered Simpson's misconduct and put an end to it.

### The NASD Arbitration

In April 1994, respondents filed a statement of claim with the NASD against Simpson and petitioners. It alleges that by engaging in the above-described conduct, Simpson violated Fla.Stat. § 517.07 (1994), which prohibits the sale of unregistered securities, and Fla.Stat. § 517.301 (1994), which prohibits the fraudulent procurement of an investment. It further contends that his conduct violated the following federal securities statutes and regulations: (1) Section 5 of the Securities Act of 1933 ("the 1933 Act"), 15 U.S.C. § 77e (prohibiting the sale of unregistered securities); (2) Section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j (prohibiting the employment of manipulative or deceptive devices "in connection with the purchase or sale of any security registered on a national securities exchange"); and Rule 10b–5, 17 C.F.R. § 240.10b–5 (prohibiting same activity as Rule 10(b)). Finally, the statement of claim charges Simpson with common law fraud, breach of fiduciary duty and civil theft (as prohibited by Florida statutory law). Respondents also contend that Simpson violated Article III, sec. 2(a) of the NASD Rules of Fair Practice, NASD Manual ¶ 2152 (1995), which requires that NASD members recommending securities transactions to clients "have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts * * *."

---

1. Royal has provided respondents with only the signature pages of the Foster agreements, along with an unexecuted agreement form which Royal asserts is identical to their agreements. In its memorandum of law, Royal explains that it did not provide a complete copy of the Fosters' agreements because they are stored on microfiche, from which only poor photocopies can be made.

In the arbitration, respondents contend that petitioners—in violation of the NASD Code and of Royal's own compliance manual—failed to investigate Simpson before giving him managerial authority in Royal's Cocoa Beach office; failed to put Simpson's clients on notice of his past misdeeds; and, finally, failed to terminate his employment or—at the very least—to monitor his illicit practices and to prevent them. A manual provided by Royal to its brokers and other employees, in a section entitled "Prohibited Sales and Business Practices" states (emphasis in original):

> The following is a catalogue of prohibited sales and business practices. You *cannot:*
>
> \*    \*    \*    \*    \*    \*
>
> **Borrow money or securities from, or lend money to** a client, including the deposit of personal funds in a client's account and the deposit of client funds into your account.

Affid. of Nan Foster, Respondent, Ex. A at 2.

The statement of claim asserts that petitioners, particularly Royal, are liable for Simpson's actions under a number of securities statutes: (1) Section 12 of the 1933 Act, 15 U.S.C. § 77*l* (imposing liability on "any person who * * * offers or sells a security in violation of section 77e of this title"); (2) Section 15 of the 1933 Act, 15 U.S.C. § 77*o* (imposing liability on "every person" who "controls any person liable under sections 77k or 77*l* of this title"); (3) Section 20 of the 1934 Act, 15 U.S.C. § 78t (establishing the joint and several liability of "every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder"); and (4) Fla.Stat. § 517.211 (imposing liability for use of fraudulent device in a purchase or sale of security on "every director, officer, partner, or agent of or for the purchaser or seller" if any of these "has personally participated or aided in making the sale or purchase"). The statement also asserts petitioners are liable for negligence and for Simpson's commission of civil theft, breach of fiduciary duty and common law fraud.

Respondents' NASD statement of claim contains an account of the Fosters' dealings with Simpson which differs from that presented in Nan Foster's affidavit. The statement of claim emphasizes Nan Foster's friendship with Simpson and the personal nature of the loans which the Fosters made to him. Thus it states that

> Nan Foster has described Simpson as a charming and charismatic person who, during his conversations with her, would often make references to his belief in God. Simpson, as part of his scheme to defraud the Fosters, cultivated Nan Foster as a confidant and a "friend" over a period of years by periodically discussing personal problems he was experiencing including his ongoing divorce proceeding and custody contest with Sharon Simpson.

NASD Statement of Claim, Affirm. of James M. Kaplan, Ex. D. at 19. The statement goes on to discuss the various personal reasons why Simpson needed to borrow money which he offered to Nan Foster. These included his need to pay attorneys fees for his divorce and for a child custody battle.

## DISCUSSION

Respondents assert (1) that pursuant to NASD Code § 12(a), their claims are subject to compulsory arbitration, and (2) that, in the event that their claims are not covered by § 12(a), the Fosters' claims are subject to such arbitration under the arbitration clause in their agreements with Royal.[2] Petitioners, on the other hand, assert that none of respondents claims fall within the ambit of either the arbitration clause or § 12(a), and that therefore we should permanently enjoin the arbitration. They also move—in the event that we grant respondents' motion to compel arbitration—for an order directing the arbitrators to conduct arbitration in New York.

### A. *The Motion to Compel Arbitration*

■ Where an arbitration clause exists which arguably covers the claim at issue,

---

**2.** Petitioners do not dispute that the NASD Code requires the submission of certain disputes between NASD members and "associated persons"

such as Wischmeyer and Gallino, to arbitration, at the request of the client and even in the absence of an executed arbitration agreement.

an order to arbitrate a particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

*United Steelworkers of America v. Warrior & Gulf Navigation Co.* (1960) 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409.

The NASD Code of Arbitration Procedure states in relevant part:

*Section I:* This code of arbitration procedure is described and adopted for the arbitration of any dispute, claim or controversy arising out of or in connection with the business of any member of the NASD ... (2) between or among members or public customers, or others ...

*Section 12(a):* Any dispute, claim or controversy eligible for submission under Part I of this Code between a customer and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code ...

Petitioners do not dispute that they are all subject to the above-cited provisions. Nor do they dispute that the NASD Code is sufficient in and of itself to compel arbitration of covered claims against one of its members or associated persons in the absence of a customer agreement with an arbitration clause.[3]

With the exception of Nan Foster's claim that Simpson "misappropriated" $15,000, respondents' claims are based on Simpson's having borrowed from them—and never repaid—large amounts of money. Respondents insist that such claims "arise in connection with the business of" petitioners because Simpson worked for or under them, because much of the loan money came from Royal accounts, and because Simpson often induced respondents to make loans by favorably comparing the interest rate he was offering to their returns from investments in their Royal accounts. With regard to the Fosters' misappropriation claim, they assert that it arises

from petitioners' "business" as the $15,000 in question were delivered to Simpson for deposit in one of their Royal accounts and were instead placed in a different Royal account.

We agree with respondents that the misappropriation claim falls within the scope of § 12(a). It is undoubtedly within Royal's business—as well as the business of its associated persons, Wischmeyer and Gallino—to accept client funds for deposit in investment accounts which it manages.

■ The applicability of § 12(a) to respondents' remaining claims poses a more complex question. Simpson's practice of borrowing large amounts of money and failing to repay them appears to us to have nothing whatsoever to do with Royal's business, namely, the provision of investment advice and services. However, respondents argue that petitioners breached a NASD Code provision by insufficiently supervising Simpson. That provision, § 27, provides in pertinent part:

Each [NASD] member shall establish and maintain a system to supervise the activities of each registered representative and associate person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with the rules of this Association. Final supervision shall rest with the member.

Respondents further argue that petitioners are liable for Simpson's actions under Federal and Florida securities statutes.

Royal's supervision of its registered agents is certainly part of Royal's "business." *Cf. Singer v. Jefferies & Co., Inc.* (1991) 78 N.Y.2d 76, 571 N.Y.S.2d 680, 575 N.E.2d 98 (claims by a former employee of a securities firm that it had injured his reputation by using him as an "unwitted pawn in an illegal stock trading scheme" arose out of "the business" of the employer and were thus arbitrable under the NASD Code); *Flanagan v. Prudential–Bache Securities, Inc.* (1986) 67 N.Y.2d 500, 504 N.Y.S.2d 82, 495 N.E.2d 345. Whether or not respondents can establish petitioners' supervisorial liability under any

---

3. *See, e.g., Oppenheimer & Co., Inc. v. Neidhardt* 1994 WL 176976 (S.D.N.Y. May 5, 1994); *Scobee Combs Funeral Home, Inc. v. E.F. Hutton &* *Company, Inc. and G. Donald Fenton* (S.D.Fla. 1989) 711 F.Supp. 605.

statute or common law theory—a matter wholly unclear to us—is a matter for the arbitrators and not for us.

Because we have determined that all of respondents' claims are arbitrable under NASD Code § 12(a), we need not consider whether the Fosters' claims must be arbitrated under the specific clause in their Royal agreements.

### B. Petitioners' Motions

■ Having determined that we shall compel arbitration, we must deny petitioners' motion to enjoin such proceeding. Petitioners have also moved for an order directing that the arbitration be held in New York. They note that the Foster agreements includes a New York choice of law provision; that Royal and IREC have their principal places of business in New York City; that the NASD maintains its principal arbitration facilities in New York; and that respondents have already retained New York-based counsel in this matter. We deem it more appropriate for the arbitrators to consider such factors in deciding where the arbitration should take place.

### CONCLUSION

We grant respondents' motion to compel arbitration and deny petitioners' motions for a permanent injunction of the arbitration and for an order directing that it be held in New York.

**SO ORDERED.**