**FIRST MONTAUK SECURITIES CORP., Plaintiff,**

v.

**FOUR MILE RANCH DEVELOPMENT COMPANY, INC., a Colorado corporation; Horse Shoe Acres, Inc., a Colorado corporation; Upper Four Mile Road Ranch Company, a Colorado corporation, and Lester B. Colodny as Agent and/or Trustee, Defendants.**

**No. 98–8045–CIV.**

United States District Court, S.D. Florida.

March 17, 1999.

Bradford David Kaufman, Anne Tennant Cooney, Steel Hector & Davis, West Palm Beach, FL, plaintiff.

Debra Anne Jenks, Richard Lee Martens, Charles Leroy Pickett, Jr., Boose Casey Ciklin Lubitz Martens McBane & O'Connell, West Palm Beach, FL, for defendants.

## FACTUAL FINDINGS AND CONCLUSIONS OF LAW IN SUPPORT OF ORDER GRANTING SUMMARY JUDGMENT

FERGUSON, District Judge.

This matter came before the Court on Defendants' Motion for Summary Judgment on October 22, 1998. Upon consideration of the pleadings, the Joint Pretrial Stipulation, admissions, and affidavits on file, and the arguments and memoranda of the parties, the Court makes the following findings of fact and legal conclusions in support of the Order entered on October 28, 1998.

### FACTS

*Allegations of Ranch's NASD Statement of Claim*

On January 2, 1998, First Montauk Securities Corp. ("First Montauk") received service of a Statement of Claim for arbitration that Defendants (hereinafter "Ranch") filed with the National Association of Securities Dealers, Inc. ("NASD") which demanded arbitration of a claim against First Montauk.[1] Ranch's NASD Statement of Claim made *allegations* of a nation-wide highly sophisticated trading scheme in certain securities known as collateralized mortgage obligations ("CMOs"), involving a broker employed by First Montauk which had defrauded Four Mile Ranch of several thousand dollars to the substantial benefit of the broker and First Montauk.

Ranch's NASD Statement of Claim alleged that First Montauk and Comprehensive were directly and vicariously liable for numerous wrongful acts and omissions, including acts of negligence, fraud, breach of fiduciary duty, civil theft, and violation of federal and Florida securities laws. Specifically as to First Montauk, Ranch alleged, *inter alia*, that First Montauk wrongfully failed to supervise its broker Muller, wrongfully exercised its duties as a control person under 15 U.S.C. § 78t and 15 U.S.C. § 77o over Muller, wrongfully failed to implement a reasonable system of supervision, wrongfully failed to maintain adequate books and records required by the NASD, made misrepresentations and wrongful omissions related to the risk and value of securities, and wrongfully opened, transacted, and maintained business in regards to Ranch.

*NASD Authority*

In its NASD Statement of Claim, Ranch alleged that First Montauk is obligated to arbitrate Ranch's claim under Article VII, § 1(a)(3) of the NASD By–Laws and NASD Code Of Arbitration Procedure Rules 10101 and 10301 (hereinafter "NASD Rule ____"). Article VII, § 1(a)(3, of the NASD By–Laws[2] provides in pertinent part:

**Powers and Authority of Board Of Governors**

The Board of Governors shall be the governing body of the Corporation [the NASD] and ... shall be vested with all powers necessary for the management and administration of the affairs of the Corporation and the promotion of the Corporation's welfare, objects and purposes. In the exercise of such powers, the Board of Governors, shall have the authority to ... make such regulations, issue such orders, resolutions, interpretations, including interpretations of the Rules, and directions, and make such decisions as it deems necessary or appropriate.

NASD Rule 10101 states:

**10101. Matters Eligible for Submission**

This Code of Arbitration Procedure is prescribed and adopted pursuant to Article VII, Section 1(a)(3) of the By–Laws

---

1. Plaintiff's Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (hereinafter "Amended Complaint"), ¶ 9 and Ranch's NASD Statement of Claim, attached as Exhibit "A" to Plaintiff's Amended Complaint. (Docket No. 8, hereinafter "Dk. 8, Ex. A, pg. ____").

2. Unless otherwise indicated, all citations to NASD authority reference the NASD Manual, July 1996 Reprint, (1996 CCH Inc.).

of the Association for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated person(s) with any member, with the exception of disputes involving the insurance business of any member which is also an insurance company:

 (a) between or among members;

 (b) between or among members and associated persons;

 (c) between or among members or associated persons and public customers, or others....

NASD Rule 10301 states:

**Rule 10301. Required Submission.**

(a) Any dispute, claim, or controversy eligible for submission under the Rule 10100 Series between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code as provided by any duly executed and enforceable written agreement or upon the demand of the customer.

First Montauk admits that it is a member of the NASD, subject to its by-laws, rules and regulations.

*Allegations of First Montauk's Amended Complaint*

On March 16, 1998, First Montauk served its Amended Complaint which requested relief based on the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., § 682.03(4) Florida Statutes, and the federal Declaratory Judgment Statute, 28

U.S.C. § 2201. First Montauk alleged that: 1) there is no written agreement to arbitrate between the parties; 2) the dispute is ineligible for submission to NASD arbitration; 3) Ranch was not First Montauk's customer; and 4) the dispute did not arise in connection with First Montauk's business. Specifically, First Montauk alleged that no transactions involving Ranch appears on its books and records, Ranch did not sign an account agreement with First Montauk, First Montauk did not issue confirmations to Ranch, Ranch did not place orders with First Montauk for securities, and Ranch did not pay First Montauk commissions for any transactions. In addition, First Montauk alleged that Ranch's account was with Comprehensive and that its dealings with Comprehensive were as one broker-dealer to another. First Montauk also alleged that Ranch had an account with Asset Reporting Systems, Inc. ("Asset Reporting") and that any dealings Muller had with Ranch were on behalf of Asset Reporting, not First Montauk. First Montauk requested, by its Amended Complaint, that this Court declare that it is not obligated to arbitrate Ranch's claims and enjoin the NASD arbitration from going forward against it.[3]

*Record Facts Upon Which The Court Bases Its Determination*

The following are the undisputed record facts related to the issues of a written agreement to arbitrate, the eligibility of Ranch's dispute for arbitration before the NASD, Ranch's status as a customer under NASD Rule 10301, and whether Ranch's dispute arises in connection with First Montauk's business.[4]

**3.** First Montauk thereafter filed a Motion for Preliminary Injunction and Ranch moved to dismiss the Amended Complaint. Both motions were denied after hearing. Ranch then submitted an Answer and Counterclaim. Ranch's Counterclaim requested that this Court compel First Montauk to arbitrate in the NASD. Because this Court shall retain jurisdiction to compel First Montauk to arbitrate in the event that it refuses to comply, the Court shall dismiss Ranch's Counterclaim, without prejudice to reassert it in this action or any other proceeding.

**4.** Ranch's Motion for Summary Judgment asserted an entitlement to arbitrate its claims against First Montauk based on its status as a customer of First Montauk and/or First Montauk's associated person, Muller. Ranch also asserted that NASD Rule 10101's connection requirement is satisfied in a claim against a member (here, First Montauk) where the connection is with the business of the member or the activities of its associated person, Muller. Because this Court determines that Ranch was a customer of First Montauk and that Ranch's claim arises in connection with First

In or about September 1993, Comprehensive broker Schulte invited Ranch agent/trustee Colodny to meet with Schulte and First Montauk broker Muller to hear their joint presentation of an investment program for Ranch. At that first meeting, Muller and Schulte told Colodny that they had previously worked together at a firm in Houston, Texas, and that they were specialists in mortgage-backed securities, specifically CMOs. Muller also told Colodny that he was a stockbroker employed by First Montauk in its Texas office.

Muller and Schulte told Colodny that they were able to produce significantly better than average returns for Ranch through investing in CMOs, with little or no risk, and that they could guarantee that Ranch's principal would not be at risk. Muller said that his "group" at First Montauk had several "captive" insurance companies which guaranteed a ready market for any CMOs purchased by Ranch in the event that Ranch wanted to liquidate its portfolio to invest its money elsewhere. Muller represented that this "ready market" assured sales at cost or better at any time. Muller and Schulte told Colodny that any CMOs Ranch purchased could be sold at any time for at least the price Ranch paid to buy them. They represented that in a worst-case scenario Ranch was guaranteed the ability to liquidate its portfolio because of the ready market of captive insurance companies, which would enable Ranch to realize a return of 100% of the principal invested as Muller "controlled" those clients.

Colodny told Muller and Schulte that Ranch needed a safe investment for its funds, in readily marketable securities which could be liquidated easily. Muller replied that the CMOs were simple, safe investments, guaranteed by the federal government and which were highly liquid and readily marketable. Colodny told the brokers that Four Mile Ranch was going to be approved as a housing project once it was re-zoned and that Ranch would need its funds to develop the housing project and to pay off the loan which was to fund the account ("the Ranch Loan"). Schulte and Muller assured Ranch that the funds were not at risk and represented that the interest payments from the investment program could be used by Ranch to fund the housing project and repay the Ranch Loan.

The brokers' investment plan called for Ranch to open an account with Comprehensive. Muller represented to Colodny that he was going to act as the "outside manager" through First Montauk and that Schulte would act as the account executive and liaison with Muller at Comprehensive. As the "outside manager," Muller would select all CMOs to be purchased or sold consistent with Ranch's investment objectives of income and safety of principal. It is alleged that based on the representations of Muller and Schulte, Ranch opened an account with Comprehensive, initially in Colodny's name but for Ranch's benefit, with funds belonging to Ranch. Muller acted as an outside manager to Ranch's account, not just communicating with Schulte, but also on several occasions following the initial presentation, communicating directly with Colodny (both orally and in writing) regarding transactions in Ranch's account and, along with Schulte, exercising overall control of the trading activity in the account at Comprehensive.

Some of the CMOs purchased in the account of Four Mile Ranch and/or Lester Colodny as agent and/or trustee (hereinafter "Four Mile Ranch") at Comprehensive were purchased from Comprehensive, which had purchased them from First Montauk immediately prior to sale to Four Mile Ranch. First Montauk realized a profit from these transactions with Comprehensive. Likewise, some of the CMOs sold by Four Mile Ranch in the Compre-

Montauk's business, the Court will not address Ranch's alternative entitlements to arbitrate its claims against First Montauk.

hensive account to Comprehensive were immediately purchased by First Montauk from Comprehensive and resold at a profit. First Montauk did not receive a commission or compensation of any kind directly from Four Mile Ranch for the transactions in Four Mile Ranch's Comprehensive account.[5]

Four Mile Ranch never had a securities account with First Montauk, nor did it sign an account agreement with First Montauk. Four Mile Ranch's securities account was with Comprehensive and the subject CMOs were held in that account. The funds used by Four Mile Ranch to purchase the CMOs were deposited into the Comprehensive account. Four Mile Ranch never tendered a check to First Montauk or Muller to purchase CMOs or any other investments. Four Mile Ranch ultimately invested over $900,000.00 with Comprehensive for the purpose of purchasing CMOs.

Comprehensive sent account statements to Four Mile Ranch which reflected the trading in CMOs. Four Mile Ranch never received advertising literature or brochures from First Montauk, nor did it receive or fill out order tickets from First Montauk. Four Mile Ranch representatives never visited a First Montauk office and its only meetings with Muller occurred in a Delray Beach, Florida restaurant and a day or so later in Colodny's Boca Raton, Florida office. Before and during the trading at issue, Four Mile Ranch never communicated with anyone at First Montauk other than Larry Muller.

### DISCUSSION

#### Standard of Review

A district court must grant a motion for summary judgment if the pleadings, deposition, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The movant bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the "pleadings, deposition, answers to interrogatories, ... admissions [and] affidavits" which it asserts demonstrate the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323, 106 S.Ct. at 2553.

■ If the movant meets its initial burden of demonstrating its entitlement to summary judgment, the nonmoving party must then demonstrate that there is evidence from which a reasonable fact-finder could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250–55, 106 S.Ct. 2505, 2511–14, 91 L.Ed.2d 202 (1986). In determining whether the parties' evidentiary thresholds are met, the trial court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. See id., 477 U.S. at 254, 106 S.Ct. at 2513. Where the nonmoving party must meet a higher burden of proof than usual, that party must meet the same burden in resisting the summary judgment motion. See id., 477 U.S. at 252–56, 106 S.Ct. at 2512–15; see also Street v. J.C. Bradford & Co., 886 F.2d 1472, 1477 (6th Cir.1989). If the nonmoving party fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a fact-finder's verdict for the non-movant, summary judgment may be granted. See Anderson, 477 U.S. at 254–55, 106 S.Ct. at 2513–14.

The parties disagree whether the "substantive evidentiary burden" is applicable to this action. Ranch argues that one or

---

**5.** The SEC sanctioned First Montauk in connection with its supervision of the First Montauk Houston office in 1993 and 1994, including its lack of supervision of Larry Muller in connection with trading in CMOs, some of which were purchased and sold in the Four

Mile Ranch account at Comprehensive. Because liability is a question for the arbitrators and not this Court, no preclusive effect shall attach to this recitation of facts in the NASD arbitration.

more of the above-mentioned bases for the existence of a written agreement to arbitrate makes this Court's determination of eligibility, a question of the *scope* of an existing written agreement to arbitrate to which a strong presumption in favor of arbitrability applies.[6] First Montauk argues that because there is no written agreement which obligates First Montauk to arbitrate Ranch's claim, the evidentiary standard governing eligibility and customer status does not apply. *See Grundstad v. Ritt*, 106 F.3d 201, 205 n. 5 (7th Cir. 1997) ("The federal policy favoring arbitration applies to issues concerning the scope of an arbitration agreement entered consensually by the contracting parties; it does not serve to extend the reach of an arbitration provision to parties who never agreed to arbitrate in the first place").

■ The Court concludes that the "substantive evidentiary burden" is applicable to this action and involves the scope of written agreements to arbitrate therefore, unless the Court can say with positive assurance that the arbitration provisions at issue are not susceptible of an interpretation in favor of arbitration, the Court must find in favor of arbitration. *See e.g., Kidd v. Equitable Life Assur. Soc.*, 32 F.3d 516, 519 (11th Cir.1994), *cert. denied*, 522 U.S. 1028, 118 S.Ct. 626, 139 L.Ed.2d 606 (1997). Thus, the standard by which the Court reviews Ranch's motion for summary judgment flows from the confluence of the summary judgment standard and the specific evidentiary standard applicable to this action. Ranch must show that the arbitration provisions are susceptible of an interpretation in favor of arbitration. First Montauk must then demonstrate to the Court sufficient evidence upon which a reasonable fact-finder could find that the arbitration provisions at issue are not sus-

ceptible of an interpretation in favor of arbitration.

*There Is A Written Agreement To Arbitrate*

■ There are three bases for finding that there is a written agreement to arbitrate: 1) the NASD rules in and of themselves and First Montauk's admitted membership in the NASD; 2) First Montauk's written agreement with the NASD as part of its application process to abide by all provisions, conditions and covenants of the NASD By-Laws as they are or may be amended and to abide by all rulings, orders, directions and decisions of the NASD Board of Governors or any duly authorized committee; and 3) First Montauk's written admission in this proceeding that it is a member of the NASD, subject to its by-laws, rules and regulations.

NASD Rule 10301 states: "Any dispute ... between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code as provided by any duly executed and enforceable written agreement or upon the demand of the customer." First Montauk admits that it is a member of the NASD, subject to its by-laws, rules and regulations,[7] but maintains that there is no written arbitration agreement.

The Second Circuit Court of Appeal held that a brokerage firm's membership in the NASD, in and of itself, is a written agreement to arbitrate according to NASD submission rules. *See Kidder, Peabody & Co. v. Zinsmeyer Trusts Partnership*, 41 F.3d 861, 863–64 (2nd Cir.1994), *cert. denied*, 117 S.Ct. 609 (1996) (NASD rules consti-

---

**6.** *See e.g., Moses H. Cone Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Kidd v. Equitable Life Assur. Soc.*, 32 F.3d 516, 519 (11th Cir. 1994), *cert. denied*, 522 U.S. 1028, 118 S.Ct. 626, 139 L.Ed.2d 606 (1997) (interpreting NASD Rule 10101, formerly NASD Code Part I, Sec. 1).

**7.** The Rules of the NASD include Rule 10301. *See* NASD Rules 0120(k) ("Rules" means the Rules as adopted pursuant to Article VII of the By–Laws, . . . .) and Rule 10101 (Arbitration Rules are adopted pursuant to Article VII(3) of the By–Laws).

tute an agreement in writing under the Federal Arbitration Act); *see also, Spear, Leeds & Kellogg v. Central Life Assurance Co.*, 85 F.3d 21 (2nd Cir.1996) (New York Stock Exchange compulsory arbitration rules constitute an agreement in writing under the Federal Arbitration Act); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hovey*, 726 F.2d 1286, 1288–89 (8th Cir. 1984) (same).

In *Wheat, First Securities, Inc. v. Green*, 993 F.2d 814 (11th Cir.1993), the Eleventh Circuit, acknowledging the Second Circuit case law, left *open* the "tantalizing question" of whether the NASD rules and regulations, including Rule 10301, are sufficient in and of themselves [8] to compel an NASD member to arbitrate for "resolution [on] another day." *See Wheat, First Securities, Inc.*, 993 F.2nd at 820. However, the Court notes that one year after *Wheat, First*, in *Kidd*, plaintiff Kidd agreed to be bound by the NASD rules and by-laws but denied that he was obliged to arbitrate an employment dispute with an NASD member-employer. *See Kidd*, 32 F.3d at 517. The Eleventh Circuit compelled Kidd to arbitration over his objection. *See id.*

This Court, having considered the question left open in this Circuit by *Wheat, First*, agrees with the Second Circuit. First Montauk's membership in the NASD binds it to obey the NASD rules, including Rule 10301.[9] The NASD is an organization vested with congressionally delegated self-regulatory authority over its members to secure compliance with the federal securities laws and its own regulations "in order to attain and preserve the highest standards of legal and ethical behavior in the nation's securities markets." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. National Ass'n of Securities Dealers, Inc.*, 616 F.2d 1363, 1365–68 (5th Cir.1980).

Enforcement of the NASD's arbitration provisions furthers its goals of securities industry regulation and enforcement. A member-firm's failure to honor an arbitration award or injunctive order, or failure to produce documents in arbitration, or most importantly, failure "to submit a dispute for arbitration under the NASD Code of Arbitration Procedure as required by that Code," "may be deemed conduct inconsistent with just and equitable principles of trade and a violation of Rule 2110" which requires NASD members to observe high standards of commercial honor and just and equitable principles of trade. *See* NASD Rule IM–10100 (Failure to Act Under Provisions of Code of Arbitration Procedure); NASD Rule 2110. Moreover, First Montauk's written admission in this proceeding that they are bound by NASD rules constitutes an acknowledgment of its obligation to arbitrate disputes with public customers.

■ It is now fairly established that a person or entity's contractual agreement with the New York Stock Exchange ("NYSE") or the NASD which obligates the person/entity to arbitrate according to NYSE or NASD arbitration provisions may be enforced by a non-party to the agreement—even though there is no *direct* agreement between the party seeking to invoke arbitration and the party seeking to avoid it. *See e.g., Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 n. 2, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (employee's Form U–4 agreement to arbitrate claims against the employer is agreement with the NYSE and is enforceable by the employer without regard to whether an employer-employee contract contains an arbitration clause); *see also Kidd*, 32 F.3d at 517–20; *Zinsmeyer*, 41 F.3d at 863; *Armijo v. Prudential Ins. Co.*, 72 F.3d 793, 795, 798–800; *Patten Securities,*

---

**8.** The *Wheat, First* investors apparently did not assert that the member firm had executed a written agreement with the NASD which bound the member to abide by the NASD arbitration rules promulgated by the Board of Governors under the Board's by-law powers. *See Wheat, First*, 993 F.2d at 818.

**9.** Article VII(1)(a)(4) of the NASD By-Laws authorizes the NASD Board of Governors to *"prescribe* a code of arbitration procedure providing for the *required* or voluntary arbitration of controversies between ... members and customers or others as its shall deem necessary or appropriate."

819 F.2d at 406 (NASD Code Part I, § 8, now NASD Rule 10301, is disjunctive—members are required to submit to arbitration demands made by customers *even in the absence* of a specific contractual arbitration agreement directly between the customer and the member); *Morgan v. Smith Barney, Harris Upham & Co.,* 729 F.2d 1163, 1166 n. 4 (8th Cir.1984) (collecting cases); *Brown v. Gilligan, Will & Co.,* 287 F.Supp. 766, 769–70 (S.D.N.Y.1968) (collecting cases dating back to 1868).

First Montauk relies on *Wheat, First, supra,* for the proposition that customer status is a question of the existence of an agreement to arbitrate, i.e., that First Montauk agreed to arbitrate only those claims brought by its customers and because Ranch was assertedly not its customer, there is no agreement which obligates First Montauk to arbitrate with such non-customers. The case does not support the proposition. What the Court decided, narrowly, is that the time frame from which to judge customer status was as of the time of the events giving rise the claim and because the investors had absolutely no relationship to the member firm at the time of those events, they could not possibly invoke Rule 10301. *Id.* at 818, 820. *See also, Lehman Brothers Inc. v. Certified Reporting Co.,* 939 F.Supp. 1333, 1340 (N.D.Ill.1996).

Ranch is entitled to summary judgment on the issue of whether First Montauk is subject to a written agreement to arbitrate.[10] The Court now proceeds to determine the *scope* of NASD Rules 10101 and 10301.

*Ranch's NASD Claim Is Eligible For Arbitration*

NASD Rule 10101 sets forth the matters eligible for submission to NASD arbitration. Rule 10101 "defines the general universe of issues that *may* be arbitrated." *Thomas James Assocs., Inc. v. Jameson,* 102 F.3d 60, 64 (2nd Cir.1996).[11] In the Eleventh Circuit, "any dispute, claim, or controversy arising out of or in connection with the business of any member" or the employment of an associated person is *eligible* for submission to NASD arbitration, regardless of who brings to the claim. *See Kidd,* 32 F.3d at 519; *see also Thomas James,* 102 F.3d at 64 (interpreting *Kidd*); *Armijo,* 72 F.3d at 798–99 n. 6 (same).

As more fully set forth below, Ranch is entitled to summary judgment on the issue of whether its dispute arises in connection with First Montauk's business. Therefore Ranch is entitled to summary judgment on the issue of the eligibility for NASD arbitration of its dispute with First Montauk.

*Ranch's Dispute Arises In Connection With First Montauk's Business*

■ A dispute that arises from a firm's lack of supervision over its brokers "arises in connection with its business." *See Royal Alliance Assoc. v. Davis,* 897 F.Supp. 783, 788 (S.D.N.Y.1995). In *Royal Alliance,* a broker borrowed large sums of money from his clients. *See id.* at 784–86. The investors sought to make the broker-dealer responsible for the loans under the broker-dealer's duty to supervise its brokers and filed an NASD arbitration claim against the firm based on NASD Rule

---

**10.** The Court's determination that the NASD rules in and of themselves constitute a written agreement obligating NASD members to arbitrate according to their provisions is a question of law. The questions of fact involved in the Court's determination that First Montauk's admission in this proceeding that it is subject to the NASD rules and its Certification agreement with the NASD constitutes written agreements to arbitrate, which include the NASD arbitration rules, are governed by the summary judgment standard of review discussed above applicable to review of the scope of an arbitration agreement. *See Kidd,*

32 F.3d at 519, *quoting Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983) ("any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of a contract [or some other question]"). Here, First Montauk does not contend that it is not a party to the subject-agreements.

**11.** *Thomas James* refers to Rule 10101 by its former designation; Part I, Sec. 1.

10301.[12] *See id.* at 787–88. The brokerage firm argued, apparently, that the broker's practice of borrowing large sums of money and failing to repay them was not related to the brokerage firm's investment advice and services business. The investors countered that the brokerage firm breached the NASD rules regarding supervision of brokers: that each NASD member shall establish and maintain a system to supervise the activities of each registered representative and associated person reasonably designed to achieve compliance with applicable securities laws and the rules of the association. *See id.* at 788. The *Royal Alliance* court agreed with the investors, stating that the brokerage firm's supervision of its registered agents, is "certainly part of Royal Alliance's 'business.'" *See id.; see also Lehman*, 939 F.Supp. at 1338 (investors dispute based on allegations that NYSE member-firm disseminated false information and failed to supervise its brokers held to "arise in connection with the business" of the member firm under NYSE compulsory arbitration rule).

In *Miller v. Flume*, 139 F.3d 1130 (7th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 74, 142 L.Ed.2d 58, 67 U.S.L.W. 3002 (Oct. 5, 1998), the Seventh Circuit Court of Appeals stated that Rule 10301's nexus requirement is "quite broad, sweeping in not only claims that literally 'arise out of the business of the firm'(i.e., its buying and selling activities), but also claims that have a 'connection' with the firm's business." *Id.* at 1136. The *Miller* Court noted that NASD member firms have a duty under the NASD rules to honor arbitration awards. *See id.* Based on that duty, the firm was obligated to arbitrate the claimants' dispute with the firm which arose from that duty. *See id.*

 Here, Ranch's arbitration dispute against First Montauk arises from allegations of false statements and material omissions made by First Montauk's broker, regarding sales directed by that broker, and First Montauk's failure to supervise its broker. First Montauk has also admitted that it had a duty to supervise its registered representative Muller in accordance with the federal securities laws and the rules, regulations, and by-laws, of the NASD. Based on the foregoing, the Court concludes that Ranch has met its burden to show that the arbitration provision at issue—whether its dispute arises in connection with First Montauk's business—is susceptible under the record facts of an interpretation in favor of arbitration. Ranch is entitled to summary judgment on the issue.

### Ranch Was First Montauk's Customer

The term "customer" as it applies to NYSE Arbitration Rule 600(a) [13]—almost identical to NASD Rule 10301—was examined in *Lehman Brothers Inc. v. Certified Reporting Co.*, 939 F.Supp. 1333 (N.D.Ill. 1996). A corporation hired Lehman Brothers, a brokerage firm, to make a market its stock (to be a primary source of its stock). Lehman then allegedly issued misleading statements and allegedly "engaged in conduct designed to artificially support and manipulate the stock price." *See id.* at 1335. Some investors bought the stock from firms other than Lehman and, when the stock fell, filed arbitration claims against Lehman in the NYSE. *See id.* at 1334–36.

Lehman, an NYSE member-firm, filed an action for injunctive and declaratory relief in federal district court alleging, *inter alia*, that the investors were not its customers. Lehman argued that "a person is a customer only with respect to the firm that sold the person the security [and][b]ecause [the investors] did not pur-

---

12. The opinion refers to Rule 10301's former NASD designation, NASD Code Part III, Sec. 12(a).

13. NYSE Arbitration Rule 600(a) states: "Any dispute, claim or controversy between a customer ... and a member ... arising in connection with the business of such member shall be arbitrated ... upon the demand of a customer...." *See Lehman*, 939 F.Supp. at 1334–35.

chase the ... stock from Lehman, ... they are not its customers." *Id.* at 1340.

In its resolution of cross-motions for summary judgment, the *Lehman* .Court determined that it could not positively conclude that these investors were not Lehman's "customers" for the purposes of NYSE Rule 600(a), even though they had not purchased the securities at the firm. *See id.* at 1340. The *Lehman* court specifically observed that:

> Defining customers to include not only those who executed purchases with member firms, but also those who maintained a less formal business relationship at the time of the alleged misconduct, furthers NYSE policy and recognizes market reality. The Seventh Circuit noted in *Carlson v. Bear, Stearns & Co.*, 906 F.2d 315, 318 (7th Cir.1990) that the sale of securities "is usually a rather complex and convoluted transaction which requires the expertise and involvement of several parties to succeed." To allow Lehman to solicit Investors using allegedly bad market information without repercussion defeats the NYSE's goals of "maintaining high standards of commercial honor and integrity among its members." NYSE Const. art. 1, § 2. The Court has considered these goals, along with the federal mandate to resolve all doubts in favor of arbitration. In doing so, the Court finds that permitting Investors to compel arbitration as "customers" upholds the parties' reasonable expectations.

*Lehman,* 939 F.Supp. at 1340–41.

Like the NYSE, the NASD requires its members to observe high standards of commercial honor and just and equitable principles of trade. NASD Rule 2110.[14]

■ The Court specifically notes that NASD Arbitration Rule 10301 and its definitional rule, Rule 0120(g), are broad.[15] Rule 0120(g) simply states that "[t]he term 'customer' shall not include a broker or dealer." The NASD chose not to limit .customers to investors with accounts with the member-firm.[16] Rule 10301 and Rule 0120(g) contain no limitations other than exclusion of brokers and dealers from invoking rules relating to customers. Ranch is not a broker or a dealer, but falls within the NASD definition of "customer."

In *Oppenheimer & Co., Inc. v. Neidhardt,* 56 F.3d 352 (2d Cir.1995), the Second Circuit Court of Appeals resolved a similar issue in favor of arbitration. The brokerage firm unsuccessfully argued the investor was not a customer of the firm under NASD Rule 10301 because the broker who dealt with the investor created a false corporate account and the firm had no record of the investor, nor any account agreement with him. *See id.* at 357.

■ Here, the uncontroverted evidence of a customer relationship is more compelling than either *Lehman* or *Oppenheimer.* First Montauk admittedly had a duty to supervise its registered representative Muller in accordance with the federal securities laws and the rules, regulations, and by-laws, of the NASD. First Montauk argues that Ranch received documents from Asset Reporting Systems, Inc.[17] which demonstrate that Muller was not dealing with Ranch as an agent of First Montauk.

---

14. "A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade." NASD Rule 2110.

15. NASD Rule 0120 is the general definition section for the NASD Rules and applies to the NASD rules of arbitration. Subsection (g) addresses the term "customer."

16. For example, the NASD requires its member-firms to disclose certain books and records to the firm's "customers." NASD Rule 2270(a). For purposes of the financial condition disclosure rule, the NASD has adopted an account-related definition of the term *customer:* "As used in paragraph (a) of this Rule, the term 'customer' means any person who, in the regular course of such member's business, has cash or securities in the possession of such member." NASD Rule 2270(b).

17. First Montauk has stipulated that Asset Reporting Systems, Inc. was not a broker/dealer in 1993 or 1994.

However, those documents simply show that Muller was also wearing Asset Reporting's hat when dealing with Ranch's account and do not refute the Colodny affidavit allegation that he was told by Muller and believed at all times, that Muller was acting as an agent of First Montauk. Nor do such documents sufficiently refute the record evidence that 1) Muller told Colodny that he would manage the account through *First Montauk* by selecting and directing every purchase and sale; 2) *First Montauk* was sanctioned by the SEC related to Muller's actions *vis-a vis* Ranch and others; 3) *First Montauk* engaged in trading "some" of the securities as Ranch alleged; and 4) *First Montauk* realized a profit on those transactions.

First Montauk's argument that two of the Ranch corporate entities are somehow separate from Four Mile Ranch and Colodny as Agent/Trustee is contrary to the conclusion which fairly follows from the facts. Colodny's affidavit, which is unrebutted, sets forth facts regarding meetings, representations, establishment of the Comprehensive account, and management of that account as to all corporate Defendants (Four Mile Ranch Development Company, Inc., Horse Shoe Acres, Inc., and Upper Four Mile Road Ranch Co.).

Last, First Montauk also points to other record facts which it argues sufficiently demonstrates that Ranch was not its customer: that Ranch did not have an account with First Montauk, that the only First Montauk person that Ranch communicated with was Muller, and that Ranch never visited a First Montauk office. Assuming those to be true, they are insufficient to rebut evidence presented by Ranch so as to create a material fact issue.

## CONCLUSION

Based on the foregoing, the Court concludes that Ranch has met its burden to show that the arbitration provision at issue—whether Ranch was First Montauk's customer—is susceptible under the record facts of an interpretation in favor of arbitration. The Court also concludes that there is insufficient evidence upon which a reasonable fact-finder could find that the arbitration provision at issue is not susceptible to an interpretation in favor of arbitration. Ranch is entitled to summary judgment on the issue.