**INVESTORS CAPITAL CORPORATION, Plaintiff,**

v.

**Gerald H. BROWN, Helen M. Brown, Defendants.**

**No. 6:00–CV–595–ORL31C.**

United States District Court, M.D. Florida, Orlando Division.

Nov. 27, 2000.

Burton Webb Wiand, Katherine C. Lake, Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, FL, for plaintiff.

Joel A. Goodman, Stephen Craig Krosschell, Goodman & Nekvasil, P.A., Clearwater, FL, for defendants.

## ORDER

PRESNELL, District Judge.

This cause comes before the Court on Motion to Compel Arbitration and to Stay Action (Doc. 10) filed JULY 17, 2000.

The United States Magistrate Judge has submitted a report recommending granting in part and denying in part.

After an independent *de novo* review of the record in this matter, and noting that no objections were timely filed, the Court concurs with the findings of fact and conclusions of law in the Report and Recommendation. Therefore, it is **ORDERED:**

1. That the Report and Recommendation filed OCTOBER 30, 2000 (Doc. 51) is **ADOPTED** and **CONFIRMED** and made a part of this Order.

2. That defendant's July 17, 2000 Motion to Compel Arbitration and to Stay this Action (doc. 10) is GRANTED in part as to compelling arbitration, and DENIED in part as moot as to any stay; and

3. That the action is otherwise DISMISSED without prejudice so that Defendants may pursue their counterclaims in the arbitration already commenced.

## DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS

GLAZEBROOK, United States Magistrate Judge.

### I. *INTRODUCTION AND PROCEDURAL SETTING*

At some time prior to October 1998,[1] Gerald H. and Helen M. Brown and Cecil T. and Elizabeth M. Bragg [the "defendant investors"] purchased securities entitled "First American Capital Trust Certificate of Commercial Note" [the "FACT notes"].[2] The defendant investors purchased the FACT notes through two individuals; Virgil A. Smith and Angela Staub. At the time of the purchases, Smith and Staub conducted their business activities through Al Smith & Associates, an insurance agency. Docket No 44[41][3] at 2.

In January and October 1998, respectively, the National Association of Securities Dealers ["NASD"] and the State of Florida licensed Smith and Staub as registered representatives of Investors Capital Corporation.[4] Docket No. 44[41] at 1–2. On January 13, 1999, Investors Capital registered Al Smith & Associates with the State of Florida as a branch office of Investors Capital.[5] Docket No. 12[11] at Tab 4, page 84. On seven occasions after October 1998 (three of which involved the Browns and four of which involved the Braggs), the defendant investors received additional FACT notes in transactions that they characterize as "sales" [Docket No. 43[39] at 2] and that Investors Capital characterizes as "rollovers." Docket No. 44[41] at 5. The parties agree on the number of these transactions but offer different dates. The defendant investors assert

---

1. Both at the September 13, 2000 hearing and in their written submissions, the defendant investors have not been eager to state the precise dates of the initial purchases.

2. At the September 13, 2000 hearing, counsel for Investor's Capital described the FACT notes as securities collaterized by sub-prime automobile paper. When asked by the Court whether the FACT notes were a "scam," he conceded for argument's sake that he thought they were. However, he noted that there had been litigation before the Florida Division of Securities regarding this issue.

3. Citations consisting of two numbers [the second of which is bracketed] indicate that the cited document appears at different docket numbers in 6:00–cv–595–Orl–31C [and 6:00–cv–598–28C,] respectively. Citations consisting of a single number indicate that the cited documents appears at the same docket number in both cases.

4. Smith commenced his employment with Investors Capital on January 1, 1998 and his license applications with the NASD and the State of Florida were approved on January 7, 1998. Docket No. 12[11] at Tab 4, page 97. Although Staub was apparently affiliated with Investors Capital as of May 22, 1998, her license applications with the NASD and the State of Florida were not approved until October 1998. Docket No. 12[11] at Tab 4, page 91.

5. According to Investors Capital's counsel, Al Smith & Associates was at the time of the FACT purchases—and presently remains—a separate entity not owned by Investors Capital.

that they participated in the following sale or rollover transactions:

| Date | Investor | Amount Invested |
|------|----------|-----------------|
| 12/14/98 | Browns | $26,803.08 |
| 12/29/98 | Browns | $40,024.77 |
| 2/20/99 | Braggs | $33,061.38 |
| 2/24/99 | Braggs | $33,061.38 |
| 4/25/99 | Braggs | $30,808.76 |
| 6/16/99 | Browns | $74,715.23 |
| 8/7/99 | Braggs | $39,457.44 |

Docket [Docket No. 43[39] at 2]. In their affidavits, Smith and Staub state that the Browns engaged in the sale or rollovers in December 1998, January 1999 and June 1999, and that the Braggs engaged in the sale or rollovers in November 1998, March 1999, May 1999 and August 1999.[6] Smith and Staub received commissions from these sale or rollover transactions. Docket No. 44[41] at 5.

Smith and Staub further allege that the defendant investors had initially purchased the FACT notes in seven transactions (three involving the Browns and four involving the Braggs) between April 1996 and March 1998, and had repurchased these notes on seven occasions (two involving the Browns and five involving the Braggs) prior to October 1998. The defendant investors' respective answers and counterclaims are silent as to these pre-October 1998 transactions. The pre-October 1998 transactions included two sale or rollover transactions that Smith alleges occurred in June and September 1998—dates on which Smith, but not Staub, was already a licensed registered representative of Investors Capital. This silence may result from a decision by the defendant investors to forgo claims arising out of conduct occurring prior to the time when both Smith and Staub were licensed registered representatives of Investors Capital. Docket No. 43[39] at ¶ 5 and 6.

In March 2000, the defendant investors (together with eleven other claimants) filed arbitration claims against Investors Capital, Smith, Staub and eight other respon-

dents with the NASD. Docket No. 12[11] at Tab 4. These claims allege, among other things, misrepresentation by Investors Capital (through Smith and Staub) in connection with the post-October 1998 sale or rollover transactions. On May 12, 2000, Investors Capital filed separate two-count complaints against the Browns [*Investors Capital Corporation v. Brown,* 6:99–cv–595–Orl–31C] and against the Braggs [*Investors Capital Corporation v. Bragg,* 6:99–cv–598–Orl–28C] in this Court. In each case, Investors Capital requested a declaration that it is not required to arbitrate the defendant investors' claims, and also requested an injunction permanently staying the two NASD arbitration proceedings. On July 17, 2000, the defendant investors answered and asserted six counterclaims against Investors Capital. Docket No. 9. At the same time, the defendant investors also filed the present motion to compel arbitration and to stay this civil proceeding. Docket No. 10.

## II. APPLICABLE LAW

### A. The Federal Arbitration Act

#### 1. Presumption Favoring Arbitration

■ Section 2 of Federal Arbitration Act [the "FAA"] provides that:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. In section 2, Congress declares a liberal federal policy favoring arbitration agreements. *Moses H. Cone Memorial Hospital v. Mercury Construction*

---

**6.** These affidavits appear at Docket Nos. 27 (Smith) and 28 (Staub) in 6:00–cv–595–Orl–31C and Docket No. 23 (both Smith and Staub) in 6:00–cv–598–Orl–28C.

*Corporation,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself, or an allegation of waiver, delay, or a like defense to arbitrability. *Moses H. Cone Memorial Hospital,* 460 U.S. at 24–5, 103 S.Ct. 927.

### 2. *Arbitration of Arbitrability*

The threshold question of who—court or arbitrator—has the primary authority to decide whether a party has agreed to arbitrate can make a critical difference to a party resisting arbitration. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 1923, 131 L.Ed.2d 985 (1995). The answer to this question turns upon what the parties have agreed about that matter. *Kaplan,* 115 S.Ct. at 1923. In resolving this question, courts generally should apply ordinary state-law principles that govern the formation of contracts. *Kaplan,* 115 S.Ct. at 1924. However, courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so. *Kaplan,* 115 S.Ct. at 1924, *citing AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Although there is a presumption in favor of arbitrability of the merits of a dispute, there is the opposite presumption regarding the arbitrability of the question of arbitrability. *Kaplan,* 115 S.Ct. at 1924. In weighing arbitrability, a reviewing court must not rule on the potential merits of the underlying claim. *AT & T,* 475 U.S. at 649, 106 S.Ct. 1415.

### B. *The NASD Code of Arbitration*

### 1. *Customer's Right to Demand Arbitration*

The NASD has adopted a comprehensive set of rules which are codified in the NASD Manual. NASD Rule 0113 states "[t]he Rules shall be interpreted in such manner as will aid in effectuating the purposes and business of the Association...." Among these rules is a Code of Arbitration Procedure. NASD Rules 10000 *et. seq.* NASD Rule 10301 states that:

Any dispute, claim, or controversy eligible for submission under the Rule 10100 Series between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code, as provided by any duly executed and enforceable written agreement or upon the demand of the customer.

NASD Rule 10100 states as follows:

This Code of Arbitration Procedure is prescribed and adopted pursuant to Article VII, Section 1(a)(iv) of the By-Laws of the Association for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated person(s) with any member, with the exception of disputes involving the insurance business of any member which is also an insurance company:

(a) between or among members;

(b) between or among members and associated persons;

(c) between or among members or associated persons and public customers, or others; and

(d) between or among members, registered clearing agencies with which the Association has entered into an agreement to utilize the Association's arbitration facilities and procedures, and participants, pledgees, or other persons using the facilities of a registered clearing agency, as these terms are defined under the rules of such a registered clearing agency.

At least two circuits have held that Rule 10301 confers an enforceable, third-party beneficiary right in a NASD member's

customers to demand arbitration, even if the investor has no individual investment contract with the NASD member. *See Kidder, Peabody & Co., Inc. v. Zinsmeyer Trusts Partnership*, 41 F.3d 861, 863–64 (2d Cir.1994); *Patten Securities Corp., Inc. v. Diamond Greyhound & Genetics, Inc.*, 819 F.2d 400, 406 (3rd Cir.1987); *accord First Montauk Securities v. Four Mile Ranch Development*, 65 F.Supp.2d 1371, 1378 (S.D.Fla.1999) ("[t]his Court having considered the question left open by *Wheat, First*, agrees with the Second Circuit"). However, the Eleventh Circuit has expressly reserved ruling on the issue of whether NASD Rule 10301 confers an enforceable, third-party beneficiary right in a NASD member's customers to demand arbitration. *Wheat, First Securities, Inc. v. Green*, 993 F.2d 814, 820 (11th Cir.1993). In a case involving an individual investment contract that incorporated the NASD Manual by reference, the Eleventh Circuit held that a provision in the Code of Arbitration stating "arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code which interpretation shall be final and binding upon the parties" did not constitute an agreement to arbitrate the issue of arbitrability:

> We conclude that, at most, section 35 creates an ambiguity as to who determines arbitrability. Because an ambiguity is insufficient to override the presumption that courts determine arbitrability, we conclude that the district court must determine whether the dispute between the Cohens and Merrill Lynch is arbitrable.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cohen*, 62 F.3d 381, 384 (11th Cir. 1995) (internal citations omitted).

### 2. *Determining Customer Status*

■ NASD Rule 0102 provides a set of definitions that apply to the NASD Rules unless the context requires otherwise. NASD Rule 0102(g) states as follows: "[t]he term 'customer' shall not include a broker or dealer." The NASD Code of Arbitration does not provide a precise definition of "customer." *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 357 (2d Cir.1995).[7] Several courts have rejected the argument that would-be claimants seeking to compel arbitration were not "customers" entitled to invoke NASD Rule 10301 unless they had accounts in their own name with the NASD member. *See Oppenheimer*, 56 F.3d at 357 ("[h]aving turned over their funds to Oppenheimer's representative so as to become customers of Oppenheimer, the Claimants did not lose the legal benefits of customer status because Oppenheimer's representative fraudulently established their account in a manner designed to conceal and defeat their interest"); *WMA Securities, Inc. v. Ruppert*, 80 F.Supp.2d 786, 789 (S.D.Ohio 1999) ("[b]y conducting business with Plaintiff's registered representatives, Defendants conducted business with Plaintiff and became its customers"); *First Montauk Securities*, 65 F.Supp.2d at 1381 (S.D.Fla.1999) ("[t]he NASD chose not to limit customers to investors with accounts with the member firm"). Customer status for the purposes of Rule 10301 must be determined as of the time of the events providing the basis for the allegations of fraud. *Wheat, First*, 993 F.2d at 820 ("[w]e cannot imagine that any NASD member would have contemplated that its NASD membership alone would require it to arbitrate claims which arose while a claimant was a customer of another mem-

---

7. Several other portions of the NASD Manual do provide context-specific definitions for the term "customer," including: NASD Rule 1120 (continuing education). NASD Rule 2270 (disclosure of financial condition to customers), NASD Rule 2520 (margin requirements), NASD Rule 6951 (audit trail requirements). In addition, various of the rules regulating broker-dealers and national securities associations promulgated by the Securities Exchange Commission under the Securities Exchange Act of 1934 also provide definitions of "customer," including: Rule 15c3–2 (customers' free credit balances); Rule 15c3–3(a)(1) (reserves and custody of securities); Rule 17f–1(a)(4) (requirements for reporting and inquiry with respect to missing, lost, counterfeit or stolen securities).

ber merely because the claimant subsequently became its customer.")

### C. *Compelling and Resisting Arbitration*

Sections 3 and 4 of the FAA provide parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration (Section 3), and an affirmative order to engage in arbitration (Section 4). *Moses H. Cone Memorial Hospital,* 460 U.S. at 22, 103 S.Ct. 927. Section 3 provides that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, **upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement,** shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis supplied). Section 4 provides that:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and **upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue,** the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

9 U.S.C. § 4 (emphasis supplied).

 Under both § 3 and § 4, a reviewing court must limit its review to issues relating to the making and performance of the agreement to arbitrate. *See Prima Paint Corp. v. Flood & Conklin Mfg.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Thus, for instance, a reviewing court may consider a claim for fraud in the inducement of the arbitration clause, but not a claim for fraud in the inducement of the contract generally. *Prima Paint,* 388 U.S. at 403–04, 87 S.Ct. 1801. The party seeking to avoid arbitra-

tion must unequivocally deny that an agreement to arbitrate was reached, and must offer "some evidence" to substantiate the denial. *Wheat, First,* 993 F.2d at 817. *See also, Oppenheimer,* 56 F.3d at 358 ("it is not sufficient for the party opposing arbitration to utter general denials of the facts on which the right to arbitration depends.") In the context of NASD arbitration, the issue of whether a would-be arbitration claimant is a "customer" entitled to invoke NASD Rule 10301 is a threshold question going to the existence of an agreement to arbitrate, and not to the agreement's scope. See *Wheat, First,* 993 F.2d at 820–1 ("[b]ecause we find that the Appellants were not Wheat First customers for purposes of the NASD Code, we do not reach the question of whether the Appellants' claims arose 'in connection with the business of' Wheat First, nor do we reach the broader question of whether Wheat First's membership in the NASD is a sufficient basis in itself for compelling arbitration of disputes that are covered by the NASD Code.")

### D. *Motions to Compel Arbitration Determined by Summary Judgment Standard*

■ The *Oppenheimer* decision arose in the context of competing motions by the plaintiff brokerage firm to stay, and by the defendant investors to compel arbitration. The *Oppenheimer* court applied a summary judgment analysis, concluding that the plaintiff brokerage firm had "failed to raise a genuine issue of fact for trial." *Oppenheimer,* 56 F.3d at 358. In weighing the evidence submitted by the parties, the *Oppenheimer* court cited by way of analogy to Federal Rule of Civil Procedure 56(c) and (e). *Oppenheimer,* 56 F.3d at 358.

Federal Rule of Civil Procedure 56(c) provides that the party making a motion for summary judgment may submit affidavits to support its argument as to the absence of a genuine issue of material fact. Rule 56(e) provides as follows regarding the materials that the non-movant must submit in response:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

The non-movant must adduce significant probative evidence that would be sufficient for a jury to find for the non-movant. *LaChance v. Duffy's Draft House,* 146 F.3d 832, 834 (11th Cir.1998), *citing Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505.

When a party making a Rule 56 motion has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman,* 873

F.2d 256 (11th Cir.1989); *Samples on Behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988).

The Eleventh Circuit has explained the reasonableness standard:

> in deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." [citation omitted]. The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

*Jeffery v. Sarasota White Sox*, 64 F.3d 590, 594 (11th Cir.1995), quoting *WSB–TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988). Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *Augusta Iron and Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. 2505. On a summary judgment motion, the Court may not weigh the credibility of the parties. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987). If the determination of the case rests on which competing version of the facts or events is true, the case should be presented to the trier of fact. *Rollins*, 833 F.2d at 1531.

8. Investors Capital also submitted affidavits

## III. APPLICATION AND ANALYSIS

### A. The Court, Not the Arbitrators, Must Determine Arbitrability

In their motion to compel arbitration, the defendant investors claim a right to demand arbitration pursuant to NASD Rule 10301, based solely on their status as third-party beneficiaries of the membership agreement between the NASD and Investors Capital. Docket No. 10. At the September 13, 2000 hearing, counsel for the defendant investors conceded that the defendant investors lacked individual arbitration agreements with Investors Capital. The defendant investors have adduced no evidence of an express agreement of the parties to arbitrate the issue of arbitrability. Therefore, the Court (and not the NASD arbitrators) must determine the issue of arbitrability. *Kaplan*, 115 S.Ct. at 1924. The Court must limit its review to issues relating to the making and performance of the agreement to arbitrate. *Prima Paint*, 388 U.S. at 404, 87 S.Ct. 1801.

### B. The Threshold Question—Whether the Defendant Investors Were NASD Rule 10301 "Customers"

In assessing the defendant investors' claim to third-party beneficiary status under NASD Rule 10301, the Court must first determine as a threshold matter whether the defendant investors are "customers" within the meaning of that rule. *Wheat, First*, 993 F.2d at 820–21.

#### 1. Burden of Proof

As the party resisting arbitration, Investors Capital must offer "some evidence" to substantiate its denial of the existence of an agreement to arbitrate. *Wheat, First*, 993 F.2d at 817. Because the parties agree that the existence of an agreement to arbitrate in this matter turns on whether the defendant investors are "customers" entitled to invoke NASD Rule 10301, Investors Capital must offer "some evidence" to substantiate its denial of the defendant investors' "customer" status. Both the defendant investors and Investors Capital rely primarily[8] on competing affidavits

by John Babiarz (the Assistant to the Compli-

from the Browns,[9] the Braggs,[10] Smith and Staub.[11] In weighing these affidavits, the Court applies the same Rule 56(c) and (e) analysis that the Second Circuit applied in *Oppenheimer.* The Court looks to whether Investors Capital has succeeded in identifying a genuine of fact that remains for trial. *Oppenheimer,* 56 F.3d at 358. The Court draws all inferences in the light most favorable to the non-movant, Investors Capital.

### 2. *There Remains No Genuine Issue of Triable Fact As to Whether the Defendant Investors Were "Customers"*

■ Essentially, the defendant investors assert that there is no genuine issue of material fact as to their status as NASD Rule 10301 "customers."[12] In support of this contention, the defendant investors offer nearly identical joint affidavits from the Browns and the Braggs. Investors Capital counters with nearly identical affidavits from Smith and Staub. The Smith and Staub affidavits rebut some, but not all, of the principal assertions in the Brown and Bragg affidavits. The Smith and Staub affidavits are emphatic, but carefully worded to stop short of denying important contentions. Left unrebutted are key allegations that require the Court to conclude, from the present record and for purposes of the present arbitrability analysis, that the defendant investors are NASD Rule 10301 "customers."

The defendant investors allege in their affidavits that they made investments in FACT notes on seven occasions in 1998 and 1999, and that prior to each of these investments, "Smith and Staub identified themselves as and repeatedly represented to us that they were securities brokers who worked for Investors Capital." The defendant investors also allege that they that met with Smith and Staub "on numerous occasions" at an office located at 317 No. Main Street Apopka, Florida. The Smith and Staub affidavits concede the existence of the sale or rollover transactions (though, as noted above, they offer different dates) and concede that Smith and Staub were registered representatives of Investors Capital at the time of the sale or rollover transactions. Smith and Staub do not deny or refute the defendant investors' allegation of "numerous" meetings at the Apopka office.

The defendant investors allege in their affidavits that "[w]e relied upon and followed (i.e., purchased) our Investors Capi-

ance Director of Investors Capital) and Timothy B. Murphy (the President of Investors Capital). The Babiarz affidavit appears at Docket No. 23 in both 6:00–cv–595–Orl–31C and 6:00–cv–598–Orl–28C. The Murphy affidavit appears at both Docket No. 33 and Docket No. 34 in 6:00–cv–595–Orl–31C and at Docket No. 29 in 6:00–cv–598–Orl–28C. The Babiarz affidavits state, in relevant part, that "[b]ased on my review of the company's computer records, [the defendant investors] have never purchased any products through Investors Capital." The Babiarz affidavit filed in 6:00–cv–595–Orl–31C refers to "Julius and Ruth Eagerman" rather than the Browns. At the September 13, 2000 hearing, counsel for the defendant investors conceded that neither the Browns nor the Braggs had investment agreements or accounts with Investors Capital.

9. The Browns' joint affidavit appears at Docket No. 36 in 6:00–cv–595–Orl–31C, and is also reprinted in the comparison table attached as Appendix A.

10. The Braggs' joint affidavit appears at Docket No. 32 in 6:00–cv–598–Orl–28C, and is also reprinted in the comparison table attached as Appendix A.

11. The Smith and Staub affidavits appear at Docket Nos. 27 (Smith) and 28 (Staub) in 6:00–cv–595–Orl–31C and Docket No. 23 (both Smith and Staub) in 6:00–cv–598–Orl–28C. All four of these affidavits are reprinted in the comparison table attached as Appendix B.

12. In the complaint, Investors Capital seeks a declaratory finding that the defendant investors' claims are not arbitrable. The defendant investors' motion to compel arbitration seeks a determination that, as a matter of law, the defendant investors' claims must be arbitrated. In essence, the defendant investors' motion to compel arbitration seeks summary judgment on Investor Capital's entire claim for declaratory relief (but not on the defendant investors' counterclaims).

tal brokers' (Smith and Staub) investment advice [13] and recommendations to invest in First American Capital Trust Certificates of Commercial Note ('FACT')." The Smith and Staub affidavits merely state that Smith and Staub did not solicit the sale or rollover transactions, and that "[t]he transactions were between the [defendant investors] and FACT." Smith and Staub concede that they received commissions on the sale or rollover transactions. In the case of the Browns, the Smith and Staub affidavits also concede that Smith and Staub "did respond to questions from the Browns about the form for their repurchase." [14] The affidavits are silent as to other participation. This Court is not required by Rule 56 to, and does not, read Smith and Staubs assertion that they did not solicit the sale or rollover transactions as tantamount to a denial of the allegation that they gave investment advice and made recommendations to invest in the FACT notes.

The defendant investors allege in their affidavits that

> We purchased the above-listed FACT investments in reliance upon Smith and Staub's representations that they worked for and were brokers with Investors Capital, a reputable brokerage firm. We assumed that Investors Capital was supervising Smith and Staub and was reviewing and approving all of their investment advice and ideas to us.

Smith and Staub's rebuttal is two-fold. First, the Smith and Staub affidavits allege that "I never represented to [the defendant investors] that the FACT purchases had anything to do with Investors Capital." Second, the Smith and Staub affidavits allege that "Investors Capital was in no way involved with the transactions or the payment of commissions." [15]

Smith and Staub have not rebutted the defendant investors' allegations. In light of Section 15(b)(4)(E) of the Securities Exchange Act of 1934,[16] Smith and Staub (as registered representatives of Investors Capital) were subject to Investors Capital's general supervision. Even if Smith and Staub did not represent that Investors Capital had a particular involvement with this transaction (*e.g.*, the transaction was executed through accounts with, or cleared by, Investors Capital) or with the FACT notes, the critical claims of the defendant investors remain unrebutted. Investors Capital may not avoid summary judgment on its claim for declaratory relief—and proceed to trial on the issue of arbitrability—on so thin a reed.

### C. *NASD Rule 10301 Creates Enforceable Third–Party Beneficiary Rights in "Customers" To Demand Arbitration*

■ Having concluded that the Browns and the Braggs are, for purposes of the present arbitrability analysis, "customers" within the meaning of NASD Rule 10301, the Court reaches the question left open by *Wheat, First.* The Court agrees with the Second and Third Circuits (and the Southern District of Florida) that NASD Rule 10301 confers an enforceable, third-party beneficiary right in a NASD member's customers to demand arbitration.

---

**13.** The Braggs' joint affidavit (appearing at Docket No. 32 in 6:00–cv–598–Orl–28C) reads "advise."

**14.** These statements belie the representation of Investors Capital's counsel at the September 13, 2000 hearing that Smith and Staub had no involvement in the sale of rollover transactions.

**15.** The affidavit submitted by Investors Capital's President Timothy B. Murphy similarly states that, "Investors Capital was not involved in the sale, promotion, or marketing of FACT notes" and that "Investors Capital received no compensation from the sale of FACT notes." Docket No. 33[29]. The Murphy affidavit also contains the following conclusory statement based on hearsay statements by Smith and Staub: "[t]he brokers involved with the [defendant investors'] FACT transactions have assured Investors Capital that the [defendant investors] would not have considered Investors Capital as being part of their transactions."

**16.** *See* section III.D below.

The reasoning in *Kidder, Peabody,* 41 F.3d at 863 is most compelling. The Court concludes that this interpretation best comports with both Congress' goals in enacting the FAA, and with the NASD's goals in adopting the NASD Rules.[17]

### D. *The Defendant Investors' Grievance Arises in Connection With Investors Capital's Business*

■ In the alternative, Investors Capital suggests that even if the defendant investors were "customers" within the meaning of NASD Rule 10301, their grievance does not "aris[e] in connection with the business of" Investors Capital within the meaning of NASD Rule 10301. Docket No. 44[41] at 7. In support of this argument, Investors Capital offers the affidavit of its President Timothy B. Murphy, which states in relevant part as follows:

> Investors Capital operates through various independent contractors. These independent contractors are often involved in any number of outside business activities. For example, some brokers are also involved in tax preparation, insurance sales, and other business activities totally unrelated to Investors Capital. Their customers are well aware of these facts, and in many instances, have no reason to know of our firm's existence.

Docket No. 33[29]. The Court declines to adopt such a narrow definition of the "business" of Investors Capital. Whatever the effect (if any) of the "independent contractor" label for tax or agency law purposes, it is not determinative for federal

---

17. The NASD is a national security association registered with the Securities Exchange Commission under section 15A of the Securities Exchange Act of 1934. 15 U.S.C. § 78*o*–3. Section 15A(b) states that the Securities Exchange Commission shall not register a national security association under section 15A unless certain conditions are met. These include the following requirements:

> (2) Such association is so organized and has the capacity to be able to carry out the purposes of this chapter and to comply, and (subject to any rule or order of the Commission pursuant to section 17(d) or 19(g)(2) of this title) to enforce compliance by its members and persons associated with its members, with the provisions of this chapter, the rules and regulations thereunder, the rules of the Municipal Securities Rulemaking Board, and the rules of the association.

> \* \* \* \* \* \*

> (6) The rules of the association are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, to fix minimum profits, to impose any schedule or fix rates of commissions, allowances, discounts, or other

fees to be charged by its members, or to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this chapter or the administration of the association.

15 U.S.C. § 78*o*–3(b)(2), (6). Article XI. Section 1 of the NASD By–Laws state that:

> To promote and enforce just and equitable principles of trade and business, to maintain high standards of commercial honor and integrity among members of the NASD, to prevent fraudulent and manipulative acts and practices, to provide safeguards against unreasonable profits or unreasonable rates of commissions or other charges, to protect Investors and the public interest, to collaborate with governmental and other agencies in the promotion of fair practices and the elimination of fraud, and in general to carry out the purposes of the NASD and of the Act, the Board is hereby authorized to adopt such rules for the members and persons associated with members, and such amendments thereto as it may, from time to time, deem necessary or appropriate. If any such rules or amendments thereto are approved by the Commission as provided in the Act, they shall become effective Rules of the Association as of such date as the Board may prescribe. The Board is hereby authorized, subject to the provisions of the By–Laws and the Act, to administer, enforce, suspend, or cancel any Rules of the Association adopted hereunder.

NASD Rule 0113 states "[t]he Rules shall be interpreted in such manner as will aid in effectuating the purposes and business of the Association...."

securities law purposes. *See Securities and Exchange Commission v. Zahareas,* 100 F.Supp.2d. 1148, 1153 (D.Minn.2000). Broker-dealers have an obligation to supervise their associated persons. Section 15(b)(4)(E) of the Securities Exchange Act of 1934 provides that the Securities Exchange Commission may sanction a broker-dealer who "fails reasonably to supervise" an associated person. 15 U.S.C. § 78*o* (b)(4)(E). In the context of NASD Rule 10301, one court has found that a dispute arising from a brokerage's alleged lack of supervision over its brokers arises in connection with its business. *First Montauk,* 65 F.Supp.2d. at 1379, *citing Royal Alliance Assoc. v. Davis,* 897 F.Supp. 783, 788 (S.D.N.Y.1995). In any event, the dispute does arise "in connection with the activities of such associated persons" of Investors Capital—*i.e.* Smith and Staub. The dispute is arbitrable under NASD Rule 10301 and the FAA, which is consistent with the Congressional policy favoring arbitration.

For the above reasons, it is hereby

**RECOMMENDED** that defendants' July 17, 2000 motion to compel arbitration and to stay this action [Docket No. 10] be **GRANTED in part** as to compelling arbitration, and **DENIED in part as moot** as to any stay; it is

**FURTHER RECOMMENDED** that the action be otherwise **DISMISSED without prejudice** so that defendants may pursue their counterclaims in the arbitration already commenced.

Failure to file and serve written objections to the proposed findings and recommendations in this report, pursuant to 28 U.S.C. § 636(b)(1)(B) and (e) and Local Rule 6.02, within eleven days of the date of its filing shall bar an aggrieved party from a de novo determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal. Any objections to this report and recommendation must be accompanied by a transcription of the September 13, 2000 hearing. October 27, 2000.

APPENDIX A
DEFENDANT INVESTORS' AFFIDAVITS
(differences reflected with double underline)

| Investors Capital Corporation v. Brown, 6:99-cv-595-Orl-31C Affidavit of Gerald H. and Helen M. Brown [Docket No. 36] | Investors Capital Corporation v. Bragg, 6:99-cv-598-Orl-28C Affidavit of Cecil T. and Elizabeth M. Bragg [Docket No. 32] |
|---|---|
| 1. Our names are Gerald H. Brown, who is eighty-four (84) years old, and Helen M. Brown, who is seventy-nine (79) years old. We have been married for the past fifty-four (54) years. We reside in Altamonte Springs, Florida, which is located in Seminole County. | 1. Our names are Cecil T. Bragg, who is seventy (70) years old, and Elizabeth M Bragg, who is sixty-six (66) years old. We have been married for the past fifty (50) years. We reside in Zellwood, Florida, which is located in Orange County. |
| 2. We knew and believed that Virgil Smith (a/k/a Al Smith, hereafter referred to as "Smith") and Angela M. Staub (hereafter referred to as "Staub" worked for and were brokers and licensed securities representatives for Investors Capital Corporation (hereafter "Investors Capital") during the years 1998 and 1999. We relied upon and followed (i.e., purchased) our Investors Capital brokers' (Smith and Staub) investment advice and recommendations to invest in First American Capital Trust Certificates of Commercial Note ("FACT'") on the below-listed dates and in the corresponding amounts invested: | 2. We knew and believed that Virgil A. Smith (a/k/a Al Smith, hereafter referred to as "Smith") and Angela M. Staub (hereafter referred to as "Staub") worked for and were brokers and licensed securities representatives for Investors Capital Corporation (hereafter "Investors Capital") during the years 1998 and 1999. We relied upon and followed (i.e., purchased) our Investors Capital brokers' (Smith and Staub) investment advise and recommendations to invest in First American Capital Trust Certificates of Commercial Note ("FACT") on the below-listed dates and in the corresponding amounts invested: |

FACT INVESTMENT RECOMMENDATIONS TO
GERALD H. BROWN AND HELEN M. BROWN BY
THEIR INVESTORS CAPITAL BROKERS —
SMITH AND STAUB

| Date Invested | Investment | Amount Invested |
|---|---|---|
| 12/14/98 | FACT | $36,803.08 |
| 12/29/98 | FACT | $40,024.77 |
| 6/16/99 | FACT | $74,715.23 |

GRAND TOTAL: $141,543.08

FACT INVESTMENT RECOMMENDATIONS TO CECIL
T. BRAGG AND ELIZABETH M. BRAGG BY THEIR
INVESTORS CAPITAL BROKERS —
SMITH AND STAUB

| Date Invested | Investment | Amount Invested |
|---|---|---|
| 2/20/99 | FACT | $ 33,061.38 |
| 2/24/99 | FACT | $ 33,061.38 |
| 4/25/99 | FACT | $ 30,808.76 |
| 8/7/99 | FACT | $ 39,457.44 |

GRAND TOTAL: $136,388.96

| | |
|---|---|
| 3. Prior to each of the above-listed FACT investments we made in 1998 and 1999, Smith and Staub identified themselves as and repeatedly represented to us that they were securities brokers who worked for Investors Capital. We met with and spoke to our Investors Capital brokers (Smith and Staub) on numerous occasions at the following office location: | 3. Prior to each of the above-listed FACT investments we made, Smith and Staub identified themselves as and repeatedly represented to us that they were securities brokers who worked for Investors Capital. We met with and spoke to our Investors Capital brokers (Smith and Staub) on numerous occasions concerning their FACT investment advice at the following office location: |
| 317 No. Main Street Apopka, Florida 32712 | 317 No. Main Street Apopka, Florida 32712 |
| 4. Smith and Staub (our Investors Capital brokers) assured us repeatedly, amongst other things, that an investment in FACT was a safe, insured, highly-rated investment. We have now lost all of our savings invested in FACT. | 4. Smith and Staub (our Investors Capital brokers) assured us repeatedly, amongst other things, that an investment in FACT was a safe, insured, highly-rated investment. We have now lost all of our savings invested in FACT. |
| 5. We purchased the above-listed FACT investments in reliance upon Smith and Staub's representations that they worked for and were brokers with Investors Capital, a reputable brokerage firm. We assumed that Investors Capital was supervising Smith and Staub and was reviewing and approving all of their investment advice and ideas to us. We believe we were customers of Investors Capital. | 5. We purchased the above-listed FACT investments in reliance upon Smith and Staub's representations that they worked for and were brokers with Investors Capital, a reputable brokerage firm. We assumed that Investors Capital was supervising Smith and Staub and was reviewing and approving all of their investment advice and ideas to us. We believe we were customers of Investors Capital. |

APPENDIX B

INVESTORS CAPITAL'S AFFIDAVITS

(differences reflected with double underline)

| Investors Capital Corporation v. Brown, 6:99-cv-595-Orl-31C | | Investors Capital Corporation v. Bragg, 6:99-cv-598-Orl-28C | |
|---|---|---|---|
| Virgil Smith [Dkt. No. 27] | Angela Staub [Dkt. No. 28] | Virgil Smith [Dkt. No. 23] | Angela Staub (Dkt. No. 23] |
| 1. I, Virgil A. Smith, am over the age of twenty-one and am fully familiar with the facts and circumstances herein. This affidavit is based on personal knowledge. | 1. I, Angela Staub, am over the age of twenty-one and am fully familiar with the facts and circumstances herein. This affidavit is based on personal knowledge. | 1. I, Virgil A. Smith, am over the age of twenty-one and am fully familiar with the facts and circumstances herein. This affidavit is based on personal knowledge. | 1. I, Angela Staub, am over the age of twenty-one and am fully familiar with the facts and circumstances herein. This affidavit is based on personal knowledge. |
| 2. I am currently a registered representative for Investors Capital Corporation. I have been licensed with Investors Capital since January 1998. | 2. I am currently a registered representative for Investors Capital Corporation. I have been licensed with Investors Capital since January 1999. | 2. I am currently a registered representative for Investors Capital Corporation. I have been licensed with Investors Capital since January 1998. | 2. I am currently a registered representative for Investors Capital Corporation. I have been licensed with Investors Capital since January 1999. |
| 3. In December 1997 and March 1998, I sold First American Capital Trust ("FACT") commercial notes to Gerald and Helen Brown. At that time of the first purchase, I was not affiliated with Investors Capital. | 3. In July 1997, I sold a First American Capital Trust ("FACT")commercial note to Gerald and Helen Brown. At that time I was not affiliated with Investors Capital. | 3. In April and June 1996, I sold First American Capital Trust ("FACT") commercial notes to Cecil and Elizabeth Bragg. At that time I was not affiliated with Investors Capital. | 3. In February 1997 and February 1998, I sold First American Capital Trust ("FACT") commercial notes to Cecil and Elizabeth Bragg. At that time I was not affiliated with Investors Capital. |
| 4. These notes were nine month notes which the investors could repurchase at the end of that time period. | 4. These notes were nine month notes which the investors could repurchase at the end of that time period. | 4. These notes were nine month notes which the investor could repurchase at the end of that time period. | 4. These notes were nine month notes which the investor could repurchase at the end of that time period. |
| 5. The Browns repurchased their notes in September 1998 and June 1999 and December 1998 respectively. I did not solicit the repurchase but did respond to questions from the Browns about the form for their repurchase. The transactions were between the Browns and FACT. | 5. The Browns repurchased their notes in April 1998 and again in January 1999. I did not solicit the repurchase but did respond to questions from the Browns about the form for their repurchase. The transactions were between the Browns and FACT. | 5. Mr. Bragg repurchased these notes in January 1997, October 1997, June 1998, and March 1999. I was not involved in solicitation of the repurchase transactions. The transactions were between Mr. Bragg and FACT. | 5. Mr. Bragg repurchased these notes in November 1997, August 1998, and May 1999 and November 1998 and August 1999 respectively. I was not involved in the solicitation of repurchase transactions. The transactions were between Mr. Bragg and FACT. |
| 6. I did receive a commission on the repurchase since I was the agent of record on the original purchase. Investors Capital was in no way involved with the transactions or the payment of commissions. | 6. I did receive a commission on the repurchase since I was the agent of record on the original purchase. Investors Capital was in no way involved with the transactions or the payment of commissions | 6. I did receive a commission on the repurchases since I was the agent of record on the original purchase. Investors Capital was in no way involved with the transactions or the payment of commissions. | 6. I did receive a commission on the repurchases since I was the agent of record on the original purchase. Investors Capital was in no way involved with the transactions or the payment of commissions. |
| 7. I never represented to the Browns that the FACT purchases had anything to do with Investors Capital. | 7. I never represented to the Browns that the FACT purchases had anything to do with Investors Capital. | 7. I never represented to Mr. Bragg that the FACT purchases had anything to do with Investors Capital. | 7. I never represented to Mr. Bragg that the FACT purchases had anything to do with Investors Capital. |